## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN JENSEN,<br><br>                            Plaintiff,<br><br>        -against-<br><br>GIGCAPITAL3, INC., AVI KATZ, ANDREA BETTI-BERUTTO, RALUCA DINU, JOHN MIKULSKY, NEIL MIOTTO, and PETER WANG,<br><br>                        Defendants. | Case No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Steven Jensen ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This action is brought by Plaintiff against GigCapital3, Inc. ("GC3" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with GC3, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the proposed merger (the "Proposed Merger") between GC3 and Lightning Systems, Inc. ("Lightning Systems"). Plaintiff also asserts a claim against the Individual Defendants for breaching their fiduciary duty of candor/disclosure under state law.

2.      On December 10, 2020, GC3 entered into a business combination agreement (the "Business Combination Agreement"), pursuant to which each share of Lightning Systems stock will be cancelled and converted into the right to receive GC3 common stock and a contingent right

to receive a portion of the Stockholder Earnout Shares (the "Merger Consideration"). The Combined Company will continue to operate as Lightning eMotors, Inc. and trade on the NYSE under the ticker symbol "ZEV." After the closing of the Proposed Merger, GC3's current common stockholders will only retain an ownership interest of approximately 24.3% in the post-combination company.

3.     On December 31, 2020, in order to convince GC3 shareholders to vote in favor of the Proposed Merger, Defendants authorized the filing of a materially incomplete and misleading preliminary proxy statement/prospectus on Form S-4 (the "Proxy") with the SEC in violation of Sections 14(a) and 20(a) of the Exchange Act and in breach of the Individual Defendants' duty of disclosure.

4.     In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the process and background of the Proposed Merger; (ii) the financial advisors employed by the Company including, Oppenheimer & Co. Inc. ("Oppenheimer"), Nomura Securities International, Inc. ("Nomura"), and BofA Securities, Inc. ("BofA"); and (iii) the financial projections and valuations of Lightning Systems.

5.     The special meeting of GC3 shareholders to vote on the Proposed Merger is forthcoming (the "Shareholder Vote"). It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote so Plaintiff can cast an informed vote and properly exercise his corporate suffrage rights.

6.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and breach of the duty of disclosure. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Merger until the material information discussed herein is disclosed to GC3's

shareholders sufficiently in advance of the Shareholder Vote or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act and breach of the duty of disclosure.

<u>**JURISDICTION AND VENUE**</u>

7.      This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

8.      The Court has supplemental jurisdiction over the state law claim for breach of the duty of candor/disclosure pursuant to 28 U.S.C. § 1367.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman* 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* At 1316

10.      Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, GC3's common stock trades on the New York Stock Exchange, which is headquartered in this District rendering venue in this District appropriate. *See, e.g.*, United States v. Svoboda, 347

F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## **PARTIES**

11.     Plaintiff is, and at all relevant times has been, a holder of GC3 common stock.

12.     Defendant GC3 is a blank check company formed in order to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or other similar business combination with one or more businesses or entities. The Company is incorporated in Delaware and trades on the NYSE under the ticker symbol "GIK".

13.     Individual Defendant Avi Katz has been the Chief Executive Officer ("CEO") and Executive Chairman of the Company at all relevant times.

14.     Individual Defendant Andrea Betti-Berutto has served as director of the Company at all relevant times.

15.     Individual Defendant Raluca Dinu has served as director of the Company at all relevant times.

16.     Individual Defendant John Mikulsky has served as director of the Company at all relevant times.

17.     Individual Defendant Neil Miotto has served as director of the Company at all relevant times.

18.     Individual Defendant Peter Wang has served as director of the Company at all relevant times.

19.     The Individual Defendants referred to in ¶¶ 13-18 are collectively referred to herein as the "Individual Defendants" and/or the "Board", and together with GC3 they are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**I.     Background and the Proposed Merger**

20.     GC3 is a blank check company. The Company is formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

21.     Lightning Systems is an electric vehicle designer and manufacturer, providing complete electrification solutions for commercial fleets – from Class 3 cargo and passenger vans to Class 6 work trucks, and Class 7 city buses. Lightning Systems provides zero emission Class 3 to 7 BEVs and FCEVs and infrastructure solutions to commercial fleet customers. As of the date of the Proxy, Lightning Systems had over 50% market share in Class 3 to 6 EVs in 2020 and was the only company in the United States that has delivered fully functional Class 3 to 7 EVs to the end customer.

22.     On December 10, 2020, Lightning Systems and GC3 issued a press release announcing the Proposed Merger, which states in relevant part:

> **Urban Commercial Zero-Emission Vehicle Company Lightning eMotors to List on New York Stock Exchange Through Merger with GigCapital3, Inc.**
>
> - *Lightning eMotors is the leading innovator in the US commercial medium-duty Electric Vehicle ("EV") market with proprietary vehicle control software, EV chassis integration software and analytics, along with custom products including DCFC mobile charging solutions, and a host of commercial-EV focused IP*
> - *Lightning eMotors is the market share leader in Class 3-7 zero-emission vehicles and is the only manufacturer with a full line of battery and fuel cell zero-emission commercial vehicles on the road with blue-chip customers, serving a worldwide annual total addressable market of $67 billion*
> - *Production expected to reach 20,000 medium duty commercial electric vehicles by 2025*
> - *High revenue visibility with 100% of projected 2021 revenue of $63 million and 25% of 2022 projected revenue of $354 million under firm purchase orders as of today, and strong line of sight to $2 billion in projected 2025 revenue, including $1 billion from existing fleet customers*

- 
- *Transaction supported by $125 million of gross proceeds from the issuance of equity and convertible financings in a Private Investment in Public Equity (PIPE) transaction, including a commitment from BP Technology Ventures and other leading institutional investors*
- *Pro forma implied equity value of the merger is approximately $823 millio*
- *For a brief video tour of Lightning eMotors' Loveland facility please click here*

LOVELAND, Colo. (Dec. 10, 2020) – Lightning eMotors ("Lightning eMotors" or the "Company"), a leading provider of complete electrification solutions for commercial fleets, and GigCapital3, Inc. ("GIK" or "GigCapital3") (NYSE: GIK), a Technology, Media and Telecom (TMT) Private-to-Public Equity (PPE)™ corporation, today announced they have entered into a definitive agreement for a business combination that will result in Lightning eMotors becoming a publicly listed company. Upon closing of the transaction, the combined operating company will be named Lightning eMotors, Inc. and will be listed on the New York Stock Exchange under the ticker symbol ZEV.

Lightning eMotors is a high-growth electric vehicle manufacturer focused on urban commercial zero-emission vehicles. Lightning eMotors is the only operator with a full range of Class 3-7 battery-electric and fuel cell electric vehicles in production today, addressing the large and growing fleet electrification market. The Company's unique modular architecture, software-enabled platform, and integration capabilities provide a scalable, cost-effective solution to a highly segmented and customized market. Lightning eMotors' complete electrification solutions cover medium- and heavy-duty vocational vehicles including ambulances, delivery trucks, bucket trucks, food trucks, school buses and coach buses, among others. Lightning eMotors' significant time-to-market advantages over competitors have enabled the Company to capture a diverse base of blue-chip fleet customers, including Fluid Trucks, ABC Companies, ACE Parking and California State Hospitals. Currently, Lightning eMotors has a contracted order backlog of approximately 1,500 vehicles for delivery in 2021 and 2022, including the world's first fuel cell electric Class 6 truck. Lightning eMotors has the country's largest commercial zero-emission fleet vehicle manufacturing facility in the U.S. with annual production capacity of 1,000 vehicles today and expanding to 3,000 in 2021 and over 20,000 by 2025.

The additive manufacturing industry grew at a 20 percent annual compound rate between 2006 and 2016 before accelerating to 25 percent compound annual growth over the last 3 years, a rate that is expected to continue over the next decade as the market surges from $12 billion in 2019 to an estimated $146 billion in 2030. This market inflection is being driven by a shift in applications from design prototyping and tooling to mass production of end-use parts, enabled by the emergence of what Lightning Systems refers to as "Additive Manufacturing 2.0," a wave next-generation additive manufacturing technologies that unlock throughput,

repeatability, and competitive part costs. These solutions feature key innovations across printers, materials, and software and pull additive manufacturing into direct competition with conventional processes used to manufacture $12 trillion in goods annually.

Lightning Systems' cash on hand after giving effect to the transaction will enable the Company to capitalize on its position at the forefront of Additive Manufacturing 2.0 by accelerating the Company's rapid growth and product development efforts. The Company will also use the proceeds to support constructive consolidation in the additive manufacturing industry.

Lightning eMotors' co-founder and chief executive officer Mr. Tim Reeser said, "Today marks an important step forward in Lightning eMotors' mission to lead the commercial medium-duty zero-emission vehicle market. Over the last 12 years, Lightning eMotors has built its modular hardware and software platform, partnering with fleets all over the U.S. to develop best-in-class zero-emission battery-electric and fuel cell electric commercial solutions. With an estimated worldwide annual total addressable market opportunity of $67 billion for Class 3-7 vehicles, we see tremendous demand from fleets to transition their commercial vehicles from internal combustion engines to zero-emission solutions at an attractive total cost of ownership, even without state and federal grants. With municipal regulations creating zero-emission zones in 30-plus cities worldwide and corporate mandates for zero emissions at many of the largest fleet operators in the world, Lightning eMotors is poised to capitalize on the regulatory and social shift to environmentally friendly commercial vehicles. We are excited to partner with GigCapital3 and leverage their extensive entrepreneurial, operational, and capital markets expertise, as we scale the business as a public company. The capital raised in this transaction will enable Lightning eMotors to accelerate its growth plans and fulfill significant demand from our customers, including some of the most recognizable transportation, public safety, and e-commerce companies in the United States."

"GigCapital3 is thrilled to partner with Lightning eMotors, using our Private-to-Public Equity (PPE)™ platform, where GigCapital3 brings its management's well-recognized and decades-long technology public-market operational and entrepreneurial expertise to enable the successful transition of a high-growth EV company like Lightning eMotors to a publicly traded entity," said Dr. Raluca Dinu, founding managing partner of GigCapital Global and board member of GigCapital3. "Tim and his exceptional management team have successfully built out a proprietary, cost-efficient modular architecture, which is scalable and protected by robust IP that is far ahead of its competition. As a public company, Lightning eMotors will have a stronger capital structure to invest in capacity expansion, develop additional technology—both organically and through acquisitions. The combination of Lightning eMotors and GigCapital3 brings unique, attractive, and promising opportunities to all stockholders and stakeholders, while substantiating our commitment to support one of the highest impact mega-

trends of our lifetime, electrification of mobility solutions. We look forward to working with the Lightning eMotors team to build the industry leading zero-emission commercial EV company."

**Leadership Team**

The combined company will be led by Mr. Tim Reeser, who has founded and managed multiple technology and cleantech companies; Mr. Bill Kelley, Lightning eMotors' chief technology officer and chief operating officer, an automotive industry veteran with more than 35 years of automotive engineering and manufacturing experience at Borg Warner; and Ms. Teresa Covington, who will be its chief financial officer and who has 25 years of public company finance experience at automotive, defense and aerospace companies. The Lightning eMotors team has already shown its ability to deliver by successfully bringing products to market and capturing a dominant share in a nascent but rapidly growing industry. Mr. Robert Fenwick-Smith and Dr. Avi Katz will serve as co-chairmen of the board of directors of the combined company, which will include an additional seven members, including Mr. Reeser, Dr. Raluca Dinu, Mr. Ted Senko, Mr. Neil Miotto and a member to be named by BP Technology Ventures at a later date. Mr. Senko and Mr. Miotto, who is the current chairman of the GigCapital3 audit committee, will serve as independent directors and audit committee members. Collectively, these seven individuals will nominate the remaining two independent members of the board.

**Transaction Overview**

Pursuant to the business combination, GigCapital3 will acquire Lightning eMotors through a reverse merger. The business combination values Lightning eMotors at approximately $823 million pro forma equity value, at $10.00 per share. The transaction will be funded by (i) the issuance of approximately $539 million in new common stock of GigCapital3 to current holders of Lightning eMotors securities, (ii) cash from the GigCapital3 trust account of approximately $202 million, assuming no redemptions by GigCapital3's stockholders, and (iii) Transaction supported by $125 million of gross proceeds from the issuance of equity and convertible financings in a Private Investment in Public Equity (PIPE) transaction, including a commitment from BP Technology Ventures and other leading institutional investors. Following the transaction and after the payment of transaction expenses, Lightning eMotors is expected to add over $270 million of cash to its balance sheet. Assuming no redemptions of GigCapital3 shares, the current holders of Lightning eMotors securities will hold approximately 66% of the issued and outstanding shares of common stock immediately following the close of the transaction.

The boards of directors of both Lightning eMotors and GigCapital3 have unanimously approved the proposed business combination, which is expected to be completed in the first half of 2021, subject to, among other things, the approval by

GigCapital3's stockholders, satisfaction of the conditions stated in the definitive agreement, including regulatory approvals, and other customary closing conditions, including a registration statement being declared effective by the U.S. Securities and Exchange Commission (the "SEC").

Additional information about the proposed transaction, including a copy of the merger agreement and investor presentation, will be provided in a Current Report on Form 8-K to be filed by GigCapital3 with the SEC and available at www.sec.gov. Additional information about the proposed transaction will be described in GigCapital3's registration statement relating to the merger, which it will file with the SEC.

**Advisors**

BofA Securities, Inc. is serving as exclusive financial advisor, and King & Spalding LLP is serving as legal advisor to Lightning eMotors. Oppenheimer & Co. Inc., Nomura Securities International, Inc., and BofA Securities, Inc. are serving as joint placement agents on the equity and convertible financing, and Mayer Brown is serving as legal counsel to the placement agents. Oppenheimer & Co. Inc. and Nomura Greentech are serving as joint financial advisors to GigCapital3. DLA Piper LLP (US) is serving as legal advisor to GigCapital3. ICR, LLC is serving as communications advisor for Lightning eMotors.

## II.    The Proxy Omits Material Information

23.    On December 31, 2020, Defendants filed the materially incomplete and misleading Proxy with the SEC. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision in connection with the Proposed Merger.

The Misleadingly Incomplete Background of the Merger

24.    The Proxy contains a misleadingly incomplete summary of the events leading up to the Proposed Merger that omits material facts. Once a company travels down the road of partial disclosure of the history leading up to a merger, they had an obligation to provide shareholders with an accurate, full, and fair characterization of those historic events. Even a non-material fact

can trigger an obligation to disclose additional, otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders.

25.     First, in the section summarizing the *Background of the Merger*, the Proxy states that GC3 reviewed more than 10 acquisition opportunities and entered into discussions with more than 10 potential target businesses or their representatives. In addition to Lightning Systems, GC3 delivered draft term sheets or preliminary proposals, some at a high level, to 3 other prospective targets. However, the Proxy fails to disclose any details of those discussions, including offers or valuations made. Such information is directly related to the decision to approve the Proposed Merger or seek a better deal. Thus, the omission of this information renders the summary of the process misleadingly incomplete.

26.     Second, the Proxy states that GC3 executed non-disclosure agreements with at least 10 potential acquisition targets (including Lightning Systems), but fails to disclose whether such agreements contained standstills and/or "don't ask don't waive" ("DADW") provisions, including whether those provisions had fallen away upon the execution of the Business Combination Agreement or were still in effect.

27.     The express communication of the existence of such provisions is material to GC3 shareholders, as it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal.  The failure to plainly disclose the existence of DADW provisions creates the false impression that any of the parties who signed non-disclosure agreements could have made a superior proposal. However, if those non-disclosure agreements contained DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this material information renders the description

of the non-disclosure agreements the Company entered into in the Background of the Merger section of the Proxy misleading.  Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

28.     Third, the Proxy fails to disclose the timing and nature of the negotiations leading to the continued employment and/or Board memberships in the Combined Company.  Such information is important to shareholders because negotiating for continued employment and Board seats is a conflict of interest that could cause the Individual Defendants to value their own continued involvement in the Company over the value offered to shareholders. Accordingly, the omission and/or partial disclosure of this information renders the summary provided in the Proxy misleadingly incomplete.

29.     Accordingly, the omission and/or partial disclosure of this information renders the summary provided in the Proxy misleadingly incomplete.

The Misleadingly Incomplete Information Regarding the Financial Advisors

30.     The Proxy omits material information about the financial advisors, their relationships, and their roles in the events leading up to the Proposed Merger.

31.     First, the Proxy fails to state the historical relationship between Oppenheimer on the one hand, and the Company, the Individual Defendants, Lightning Systems, BP Technology Ventures, Inc., or any affiliates thereof on the other, including all compensation received or expected to be received from any work performed.

32.     Second, the Proxy fails to state the historical relationship between Nomura on the one hand, and the Company, the Individual Defendants, Lightning Systems, BP Technology Ventures, Inc., or any affiliates thereof on the other, including all compensation received or

expected to be received from any work performed.

33.     Third, the Proxy states that BofA acted both as the financial advisor for Lightning Systems and the advisor for the Company related to the PIPE Transaction, but the Proxy fails to state the compensation BofA received for acting as a financial advisor for either party, or the historical relationships between BofA on the one hand, and the Company, the Individual Defendants, Lightning Systems, BP Technology Ventures, Inc., or any affiliates thereof on the other.

34.     Disclosure of "any compensation received or to be received as a result of the relationship between" a financial advisor and the company it advises, or its related affiliates, is required pursuant to 17 C.F.R. § 229.1015(b)(4). Moreover, it is important for shareholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered when assessing how much credence to give its work or how much scrutiny to give the Proposed Merger. A reasonable shareholder would want to know what important economic motivations that the advisor might have.

The Misleadingly Incomplete Financial Projections and Valuation Information

35.     First, the Proxy omits critical financial projections for Lightning Systems, including free cash flow projections, which existed and were readily available to be disclosed (the "Cash Flow Projections"). Defendants elected to summarize Lightning Systems' financial projections, but they excised and failed to disclose the Cash Flow Projections. By disclosing certain projections in the Proxy and withholding the Cash Flow Projections, Defendants render the table of projections on page 159 of the Proxy materially incomplete and provide a misleading valuation picture of Lightning Systems.

36.     There are significant differences between cash flow projections—widely recognized as the most important valuation metric when it comes to valuing a company and its stock—and the EBITDA projections that are included in the Proxy. EBITDA projection metrics are not sufficient analogs for cash flow projections. Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected EBITDA.[1] As Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[2]  Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[3]  As a result of these material differences between EBITDA and cash flows, experts recognize cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

37.     In light of the significant differences between the Cash Flow Projections and the figures disclosed in the Proxy, the table of projections on page 159 of the Proxy is materially incomplete and misleading. By failing to include the Cash Flow Projections, the table provides a misleadingly incomplete overall valuation picture of Lightning Systems.  Simply put, cash flow projections are irreplaceable when it comes to fully and fairly understanding a company's

---

[1]     Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." Cost of Capital. 16. ("Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter…").

[2]     Elizabeth MacDonald, *the Ebitda folly*, Forbes (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[3]     Cody Boyte, *Why EBITDA is Not Cash Flow*, Axial Forum (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/

projections and value.

38.     Second, the proxy indicates that in November 2020, Lightning Systems updated their financial projections to lower the amount of projected revenues, gross profit, and EBITDA for the periods of 2020 through 2025 from what had been initially provided to GC3. However, the Proxy fails to provide the initial projections or the actual changes for the projection metrics. Given that the business of the Combined Company will be the business of Lightning Systems—which has substantial doubt about its ability to continue as a going concern—GC3 shareholders need to know how drastically Lightning Systems reduced their financial projections in the weeks leading up to the Business Combination Agreement. The omission of this information renders the summary of Lightning System's financial projections included in the Proxy misleadingly incomplete.

39.     Third, the Proxy states that GC3's officers and directors relied upon the expertise of Nomura and Oppenheimer in preparing the necessary financial analyses regarding the Proposed Merger. This indicates both that more than one analysis was performed, and that the financial advisors might have prepared analyses regarding the Proposed Merger. Moreover, Oppenheimer also provided to the Company a proposed draft Indicative Convertible Terms & Precedent Transaction Analysis. Yet, only a single Comparable Company Analysis performed by GC3 management is disclosed in the Proxy. The failure to include all financial analyses performed represents a material omission and presents a direct violation of Item 1015 and Item 14(b)(6).

40.     Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events,

uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections provided to and relied upon by the Board but failed to disclose the Cash Flow Projections, the Initial Projections, and a full accounting of the financial analyses performed. These omissions render the summary of the projections table, Lightning Systems' financial picture, the financial analysis, and the recommendation of the Board provided in the Proxy misleadingly incomplete.

41.    In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act and the Individual Defendants' duty of candor/disclosure.  Absent disclosure of the foregoing material information prior to the forthcoming Shareholder Vote, Plaintiff will be unable to cast an informed vote regarding the Proposed Merger, and is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

### COUNT I
### Against All Defendants for Violations of Section 14(a) of the Exchange Act

42.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

43.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

44.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

45.     The omission of information from a proxy will violate Section 14(a) if other SEC regulations specifically require disclosure of the omitted information.

46.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Merger.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the background of the merger; (ii) the financial advisors conflicts; and (iii) Lightning Systems' financial projections and valuation.

47.     In so doing, Defendants made misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

48.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the

Proposed Merger; indeed, the Proxy states that the financial advisors reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided them.  Further, the Individual Defendants were privy to and had knowledge of the financial projections and the details surrounding the process leading up to the signing of the Business Combination Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

49.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Business Combination Agreement.

50.     GC3 is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

51.     The misrepresentations and omissions in the Proxy are material and Plaintiff will be deprived of his right to cast an informed vote on the Proposed Merger if such misrepresentations and omissions are not corrected prior to the special meeting of GC3's shareholders.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can

Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

52.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

53.     The Individual Defendants acted as controlling persons of GC3 within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or knowledge of the misleadingly incomplete statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the material statements that Plaintiff contends are incomplete and misleading.

54.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

55.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

56.     In addition, as the Proxy sets forth at length, and as described herein, the Individual

Defendants were involved in negotiating, reviewing, and approving the Business Combination Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

57.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

58.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

59.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III
### Against the Individual Defendants for Breach of Fiduciary Duty of Candor/Disclosure

60.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

61.     By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff and all Company shareholders a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

62.     As alleged herein, the Individual Defendants breached their duty of

candor/disclosure by approving or causing the materially deficient Proxy to be disseminated to Plaintiff and the Company's other public shareholders.

63.     The misrepresentations and omissions in the Proxy are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

64.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the special meeting of GC3 shareholders to vote on the Proposed Merger or consummating the Proposed Merger, until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 25, 2021

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*